UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ESSES MASON, individually and on behalf of a class of similarly situated person,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF COOK, ILLINOIS; THOMAS DART, Sheriff of Cook County; EDWIN BURNETTE, Public Defender of Cook County; THE HON. E. KENNETH WRIGHT, Chief Judge of the Municipal Division of the Circuit Court of Cook County,<br><br>Defendants. | No. 06 C 3449<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

This proposed class[1] action challenges some procedures of the Central Bond Court in Cook County.

About eight years ago, the Presiding Judge of the First Municipal District of Cook County created, by order, the Central Bond Court. Except for cases where the prosecution seeks denial of bond for persons charged with non-probational felonies, all bond hearings "shall be conducted by means of closed circuit television."

On each court day, about 100-150 bond applicants are taken from Chicago Police lock-up to holding pens in the basement of the Criminal Courts building just below the courtroom housing the Central Bond Court.

---

[1] Under Fed. R. Civ. P. Rule 23(b)(2).

The holding pens for men are crowded well beyond their capacity. Prisoners are unable to sit, the sick and infirm are not isolated, noise levels are too high, and, at times, temperatures are uncomfortable. The great majority of people are represented by the public defender and have no chance to speak with a lawyer before their cases are called. Instead, each is briefly interviewed by a defense investigator who calls each one forward by name and records information about their residence, employment, family and military service. The information is given to the assistant public defender assigned to the bond court. The crowded conditions preclude private, confidential interviews. Moreover, the investigators, usually two or three, are allowed only 105 minutes to interview 100-150 prisoners.

As the hearings begin, the prisoners are led into a small room with a podium. There is a camera fixed on the podium that transmits the prisoner's image to the courtroom. The judge appears to the prisoner on the screen of a monitor facing the podium.

In the courtroom, an assistant public defender and an assistant state's attorney stand before the bench at the hearing. The judge and spectators see the defendant's image. The lawyers can see the image as well, though they have to move a step back and look to the side to do so. In the basement, another assistant public defender is stationed near the podium.

In the basement, the defense counsel does not speak to the Court, but simply gives the defendant a note containing the next court date and signals the defendant to remain silent and to move away when the brief hearing is over.

In practice, defense counsel is sometimes absent from the basement; the video images at both sites are grainy and poor. The usual hearings are short—30 seconds or less. The prosecutor states the charges, and the judge makes a finding of probable cause. The prosecutor asks for high

bond, reciting, if possible, prior criminal history and prior failures to appear. The public defender uses the information in the chart to ask for a lower bond. The judge sets bond and continues the case for two to three weeks. As in most courts, including this one, bond hearings are very short. In Central Bond Court, they are sometimes so fast that "it is not uncommon for the proceedings to commence" before the next defendant gets to the podium.

All of this, asserts Plaintiff, denies defendants any meaningful chance to inform the Court of information, such as an error in criminal history, that might lead to a lower bond or recognizance bond. The physical circumstances of the hearing encourage defendants to believe they have no right to speak, and the few who do are silenced by the Court. Moreover, it is said that research shows that seeing defendants on television rather than in person "may negatively prejudice the judge against the bond applicants." A judge may also miss signs of injury or illness in a defendant. Whether any of this is true remains to be seen, but it is alleged here and has been alleged before. *See United States v. Baker,* 45 F.3d 837 (4th Cir. 1995) (assessing the use of video cameras, microphones and televisions in commitment hearings).

The proposed class representative was arrested and charged with possession of a stolen car. At filing, he had not yet had his bond hearing.[2] He alleges that it would be possible, without much cost, both to conduct bond hearings with defendants physically present and to provide defendants with a meaningful opportunity to consult with counsel.

The complaint asks for declaratory and injunctive relief on due process and Sixth Amendment grounds; there are four counts in all.

---

[2] Since filing, his bond has been set at $70,000. He cannot afford to post such a bond (usually a deposit of 10% is required); he is incarcerated awaiting trial.

This lawsuit is directed at the conduct of proceedings in a state's criminal courts, which, as to Plaintiff and every likely member of the class, are ongoing. Federal courts traditionally rule on state practices only after trial and appeal remedies are exhausted, and then generally only by invalidating a judgment of conviction. As definitions of constitutional rights expanded and federal reviewing courts began to invalidate long-accepted state practices in the early 1960s, federal courts were asked to enjoin state criminal court practices. These efforts were, in the context of the judicial decision-making process, very quickly quashed.

*Younger v. Harris*, 401 U.S. 37 (1971) and its progeny "espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). The *Younger* Court instructed that "courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger*, 401 U.S. at 43-44.

Less than four years after *Younger*, the Supreme Court overturned a Court of Appeals decision allowing a class action for injunctive relief to proceed against state judges who, it had to be assumed, were discriminating against defendants based on their race. *O'Shea v. Littleton,* 414 U.S. 488 (1974). This racial animus manifested itself in sentencing and in setting bail without regard to the facts of individual cases. *Id.* at 500 (injunctive relief would disrupt "the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.").

*Younger* and *O'Shea* closed a door, and the lower courts clearly heard the snap of the lock. Challenges to bail-setting procedures were shut down (although the substance of those challenges is not precisely like those in this case). *See Tarter v. Hury,* 646 F.2d 1010 (5th Cir. 1981); *Wallace v. Kern,* 520 F.2d 400 (2d. Cir., 1975); *Mudd v. Busse,* 437 F.Supp. 505 (N.D.Ind., 1977), *aff'd*, 582 F.2d 1283 (7th Cir. 1978).

Plaintiff's counsel did not overlook *Younger* and *O'Shea* or their progeny. He has read them carefully and sought to draft around their strictures.

Plaintiff invokes the post-*O'Shea* decision in *Gerstein v. Pugh,* 420 U.S. 103 (1975). In *Gerstein,* Florida courts did not provide prompt probable cause hearings for persons arrested pursuant to a prosecutor's information. 420 U.S. at 406. The federal district court reviewing the matter found such hearings were required and then it held that an injunction requiring a hearing was permissible. *Id.* at 107-08. The Court determined that *Younger* did not bar the district court's decision, noting:

> The injunction was not directed at the state prosecutions as such, but only at the legality of pre-trial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearing could not prejudice the conduct of the trial on the merits.

420 U.S. at 108 n.9.

A federal court should abstain, pursuant to *Younger* and *O'Shea,* when three prerequisites are met: (1) the federal proceeding would interfere with ongoing state judicial proceedings; (2) those proceedings implicate important state interests; and (3) the aggrieved individual has no opportunity to raise his constitutional objection in those proceedings. *Middlesex*, 457 U.S. at 432. It is difficult to conceive of a state court proceeding that does not implicate important state interests, particularly in the criminal context. As I noted, the *Gerstein* Court dismissed the

5

*Younger* concerns in a footnote. *Gerstein*, 420 U.S. at 108 n.9. Some have interpreted *Gerstein* as "allowing injunctive relief when state courts are very unlikely to remedy the constitutional violations." Erwin Chemerinsky, *Federal Jurisdiction* § 13.4, at 835 (4th ed. 2003) (*citing* William H. Theis, Younger v. Harris*: Federalism in Context*, 33 Hastings L.J. 103, 159-169 (1981)).

*Gerstein* has been applied in numerous circumstances to permit challenges that might otherwise have been foreclosed by *Younger*. *See Tarter v. Hury*, 646 F.2d 1010 (5th Cir. 1981) (opining, in *dicta*, that it would be proper to sue to require court clerks to docket pro se motions); *Flynt v. Leis*, 574 F.2d 874, 882 (6th Cir. 1978), *rev'd on other grounds*, 439 U.S. 438 (1979) (affirming a district court's decision to go forward with a complaint about state rules barring out of state attorneys to appear *pro hac vice* in criminal cases); *Carter v. Doyle*, 95 F.Supp.2d 851 (N.D. Ill. 2000) (allowing an attack on the juvenile court practice of finding probable cause based solely on the unsworn proffer by the prosecutor)*; A.T. v. County of Cook*, 613 F.Supp. 775 (N.D. Ill. 1985) (relying on *Gerstein* to permit challenges to a juvenile court practice that allowed detainees to remain in custody solely because no parent or guardian appeared to request their release).

To see if the complaint invokes *Gerstein* rather than *O'Shea*, I must first decide what, precisely, Plaintiff wants to challenge here and whether he could raise his challenges in state court.

Plaintiff contends that the practices he is challenging—i.e. that Defendants are not physically present in the courtroom for bond hearings and have not had a meaningful opportunity to consult with counsel—could not be raised in state court.

6

Requiring the state court to have defendants physically present in the courtroom would not offend *Younger* and *O'Shea* because it would not require the continuing supervision of state court proceedings. An order to require this would be similar to the order issued in *Gerstein*. An order to bring defendant to court is much like an order to hold a hearing. An order to provide a meaningful opportunity to consult with an attorney is more complicated, but I can conceive of some form of this order that would not require federal supervision of state courts[3] and this is all that is required to survive a motion to dismiss.

Defendants say that Plaintiff can challenge the procedural and logistical flaws and seek their correction. Plaintiff could seek reconsideration of the amount of his bond (725 ILL. COMP. STAT. 5/110-6(a)) and, if that failed, he could appeal. Ill Sup. Ct. Rule 604(c).

But, Plaintiff argues, and I agree, that the suggested remedy does not permit him to present his claim to state court, it moots his case.[4] In any event, the wrong alleged here is not denial of bail that can be met; it is a denial of what is said to be a constitutionally required opportunity to seek such a bond.

Reconsideration of the amount of bail or its conditions weeks later does not correct whatever procedural rights were denied. But, reconsideration moots the claim because the hearing to reconsider will be heard with the defendant present in the courtroom, and he will be able to consult with his lawyer. While it is conceivable that the state court would choose to

---

[3] An order to the Sheriff to allow a meeting with a defender or investigator of five minutes duration in a place where conversation cannot be overheard.

[4] This was the difficulty faced by Pugh in *Gerstein v. Pugh*. Pugh's lawyer could complain that there was no probable cause hearing at which time the court would either conduct the hearing or, perhaps, a grand jury indictment might have conclusively determined probable cause. Delay in probable cause determination is, as the Supreme Court observed, not relevant to the continuing criminal proceedings.

address this issue, there is nothing in the state statute or rules which would suggest to the courts that among the remedies available to the trial or appellate court would be to order a wholesale change in Central Bond Court procedures. Neither Supreme Court rule 604(c) nor Section 110-6(a) of the Illinois Code of Criminal Procedure speaks to anything other than the specific terms of the bond set for a named individual.[5]

Bail is important to anyone charged with an offense—there are days, weeks, or even months of incarceration at stake. If Plaintiff or others are denied bail because of unconstitutional procedures, they may be entitled to the equitable relief they seek here.

So, the lawsuit survives, but there remains the issue of whether all Defendants are properly here.

Judge E. Kenneth Wright, Chief Judge of the Municipal Division of the Circuit Court of Cook County is a proper Defendant (at least for declaratory judgment purposes), and his lawyers do not dispute this. It is one of his predecessors who entered the order requiring defendants to appear by closed circuit televison. It is only he (or his successor or, possibly, the Chief Judge of the Circuit) who can alter the rule. The Sheriff of Cook County is also a proper party because only he can alter the rules and practices that limit the time allowed for client interviews and the conditions that interfere with client confidentiality. The Public Defender of Cook County has answered the complaint and does not seek dismissal. The other Defendants suggest that the Public Defender ought to be re-aligned as a party on the Plaintiff's side of the case, but I leave this to another day.

---

[5] In this respect, I will permit Defendants to seek reconsideration of the question of available remedies. There are, of course, state court remedies that might be secured by filing a separate state civil suit. However, *Younger* and *O'Shea* envision remedies that are found in the actual proceeding which is the subject of the complaint.

The County of Cook seeks a limited form of dismissal. The County does not operate or control either the Circuit Court of Cook County or the Sheriff of Cook County. It is not at the order of the County that defendants are kept in holding cells and not brought to court. The law on this point is clear. The County cannot be sued directly for the actions of constitutional officers of the County who do not serve at its pleasure. *Ryan v. County of DuPage*, 45 F.3d 1090, 1092 (7th Cir. 1995) (Sheriff); *Franklin v. Zaruba*, 150 F.3d 682, 684 (7th Cir. 1998) (Courts). There is no *respondeat superior* liability of the County for damages its constitutional officers may cause. *Moy v. County of Cook,* 159 Ill.2d 519 (1994), *Thompson v. Duke,* 882 F.2d 1180 (7th Cir. 1989). The County does not dispute that it is a necessary party in any case where damages are sought against one of its constitutional officers; this is so because the County is obliged to indemnify its officers. *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003). But indemnification is not implicated here. Plaintiff is quite clear that he seeks no damages, only equitable relief. Therefore, the County is dismissed outright.[6]

The motion to dismiss the complaint is denied. The motion to dismiss the County as Defendant is granted.

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: May 18, 2007

---

[6] If, after a decision on the merits, Plaintiff prevails, it may turn out that the practices challenged are the direct consequences of funding decisions by the County. If the County refuses to fund proper practices, there may be grounds to add the County as a party, but not today.